IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOANNA MCCOY,
*Plaintiff*,

v.

Civil Action No. ELH-12-1436

BIOMET ORTHOPEDICS, LLC, *et al.*,
*Defendants*.

———

JOSEPH OSWALD,
*Plaintiff*,

v.

Civil Action No. ELH-19-607

BIOMET ORTHOPEDICS, LLC, *et al.*,
*Defendants*.

**MEMORANDUM OPINION**

These product liability cases are rooted in an allegedly defective orthopedic device used for hip replacements. Defendants Biomet Orthopedics, LLC; Biomet, Inc.; and Biomet U.S. Reconstruction, LLC (collectively, "Biomet") designed and manufactured metal-on-metal hip implant systems, including the M2a-Magnum™ (the "Magnum") and its predecessor, the M2a-38™. Plaintiffs Joanna McCoy and Joseph Oswald, both of whom were implanted with Biomet devices between 2005 and 2007, filed suit against Biomet, alleging that the implants caused substantial injuries, necessitating subsequent hip replacement surgeries. *See* ELH-12-1436, ECF 43 (McCoy Amended Complaint); ELH-19-607, ECF 1 (Oswald Complaint).[1] In particular,

---

[1] In her amended complaint, Ms. McCoy sued Biomet Orthopedics, LLC; Zimmer Biomet Holdings, Inc.; Biomet Manufacturing Corp.; and Biomet U.S. Reconstruction, LLC. ELH-12-1436, ECF 37. Mr. Oswald sued Biomet Orthopedics, LLC; Biomet, Inc.; Biomet Manufacturing Corp.; and Biomet U.S. Reconstruction, LLC. *See* ELH-19-607, ECF 1. However, during

plaintiffs allege that the metal-on-metal design of these implants caused the device to corrode, releasing metallic debris into the bloodstream that killed surrounding tissue and bone. Further, plaintiffs assert that Biomet advertised these products as safe, despite knowing that they were defective.

Plaintiffs lodge claims exclusively under Maryland law. These include strict liability, negligence, breach of express and implied warranties, and fraudulent concealment. Jurisdiction is founded on diversity of citizenship under 28 U.S.C. § 1332.

These cases were among many filed against Biomet. On October 2, 2012, pursuant to 28 U.S.C. § 1407, the Joint Panel on Multidistrict Litigation ("JPML"), consolidated all cases involving Biomet's Magnum and the M2a-38 into a Multi-District Litigation action ("MDL") for coordinated pretrial proceedings. *See In re: Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*, 896 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012). The MDL was assigned to Judge Robert Miller, Jr. of the United States District Court for the Northern District of Indiana. *Id.* After extensive pretrial proceedings, the *McCoy* matter was returned from the MDL to the District of Maryland on September 19, 2018, as part of the first remand group. MDL-2391, MDL Dkt. No. 3724; *see* ELH-12-1436, ECF 22. The *Oswald* case was remanded to this District on February 22, 2019, as part of the third remand group. MDL-2391, Dkt. No. 3756; *see* ELH-19-607, ECF 235.[2]

---

consolidated pretrial proceedings, discussed *infra*, all Biomet corporate entities were dismissed from suit, except Biomet, Inc.; Biomet Orthopedics, LLC; Biomet Manufacturing LLC; and Biomet U.S. Reconstruction, LLC. *See* MDL-2391, Dkt. No. 2972. Accordingly, Zimmer Biomet Holdings, Inc. and Biomet Manufacturing Corp. are no longer defendants.

[2] At the time of the filing of this Memorandum Opinion, five other lawsuits are pending against Biomet in this District. *See Harris v. Biomet Orthopedics, LLC*, ELH-18-3924 (D. Md.); *Harbold v. Biomet Orthopedics, LLC*, ELH-18-3925 (D. Md.); *Kandel v. Biomet Orthopedics, LLC*, ELH-18-3924 (D. Md.); *Ringley v. Biomet, Inc.*, ELH-17-747 (D. Md.); *Laughlin v. Biomet, Inc.*, ELH-14-1645 (D. Md.). Harris, Harbold, Kandel, and Ringley filed a joint motion to consolidate. *See, e.g.*, *Harris v. Biomet Orthopedics, LLC*, ELH-18-3924, ECF 196 (D. Md.). I granted that motion. *Id.*, ECF 201; ECF 202. And, Laughlin filed a motion to consolidate her case

Plaintiffs have filed a joint motion to consolidate, pursuant to Fed. R. Civ. P. 42(a), supported by a memorandum of law. *See* ELH-12-1436, ECF 54; ELH-19-607, ECF 241 (collectively, the "Motion").[3] They submitted four exhibits with the Motion. ECF 54-1 to ECF 54-5. Defendants filed an Opposition (ELH-12-1436, ECF 65), supported by ten exhibits. ECF 65-1 to ECF 65-10.[4] Plaintiffs have replied. ELH-12-1436, ECF 66.

No hearing is necessary to resolve the Motion. *See* Local Rule 105(6). For the reasons that follow, I shall grant plaintiffs' Motion.

## I. Factual and Procedural Background

### A. Biomet's Metal-on-metal Hip Implant Systems

The hip joint connects the thigh bone (the femur) to the pelvis. ELH-12-1436, ECF 43, ¶ 13. It operates like a ball and socket: the femoral head, a ball-like structure that sits at the top of the femur bone, rotates within the cupped surface of the pelvis, or acetabulum. *Id.* In a healthy hip, the femoral head and acetabulum are cushioned and lubricated by cartilage and fluid. *Id.*

A total hip implant replaces the body's natural joint with an artificial one. *Id.* ¶ 14. Generally, these implants consist of four parts, as depicted in the diagram below: a (1) femoral stem; (2) femoral head; (3) plastic (polyethylene) liner; and (4) acetabular shell. *Id.*[5]

---

with the other pending suits. *See Laughlin v. Biomet, Inc*., ELH-14-1645, ECF 45 (D. Md.). I denied her motion, without prejudice. *Id.*, ECF 57.

The cases of *Fowler v. Biomet Orthopedics, LLC*, ELH-19-2931 (D. Md.), and *Soustek v. Biomet Mfg. Corp.*, ELH-15-1890 (D. Md.), recently settled.

[3] Plaintiffs filed the same motion in each case. Hereafter, I shall cite primarily to the *McCoy* case: ELH-12-1436.

[4] Citations to the Opposition and its exhibits likewise correspond to the filings in *McCoy*. The Opposition and exhibits are docketed at ECF 249 and ECF 249-1 in ELH-19-607.

[5] The diagram was taken from McCoy's initial complaint. *See* ELH-12-1436, ECF 1 at 5.



During the operation, the surgeon first hollows out the patient's femur bone and inserts the femoral stem. Next, the surgeon attaches the femoral head to the stem. Finally, the surgeon inserts the liner and acetabular shell to separate the metal femoral head from the acetabulum. *Id.*

Biomet's Magnum and M2a-38 devices have only three parts: a stem, femoral head, and shell. *Id.* ¶ 16; ELH-19-607, ECF 1, ¶ 14. In both devices, the femoral head and acetabular shell are made out of metal. *Id.* For that reason, these devices are known as metal-on-metal (MoM) systems. ELH-12-1436, ECF 43, ¶ 16.

Plaintiffs allege that Biomet's MoM implants were not sufficiently tested, and that the United States Food and Drug Administration ("FDA") never approved these devices as being safe and effective. *Id.* ¶ 23; ELH-19-607, ECF 1, ¶ 16. Indeed, Biomet allegedly skipped clinical testing related to metal poisoning, despite extensive scientific research warning that MoM systems pose such risks. ELH-12-1436, ECF 43, ¶¶ 24-33. According to plaintiffs, Biomet failed to perform comprehensive clinical trials, and marketed its MoM implants to surgeons and patients as being safe and longer lasting than metal-on-polyethylene implants. *Id.* ¶ 35; ELH-19-607, ECF 1, ¶ 17.

Plaintiffs allege that the grinding of the implants' metal "ball" against the metal "socket" causes tiny fragments of chromium and cobalt to slough off into the bloodstream. ELH-12-1436, ECF 43, ¶ 17; ELH-19-607, ECF 1, ¶ 15. This metal debris kills soft tissue and bone near the hip and "prompt[s] the body to react by rejecting the hip implant." ELH-12-1436, ECF 43, ¶ 18. Symptoms include pain and severe inflammation. *Id.* This corrosion also causes the implant to loosen, dislocate, and fracture. *Id.* As a result of these complications, patients implanted with Biomet's MoM implants often require "revision" surgery, by which the device is removed and replaced with a new hip implant. *Id.* ¶ 54.

Biomet allegedly knew that its devices were defective. *Id.* ¶ 52. Beginning in 2004, Biomet and the FDA began receiving complaints reporting that the Magnum and M2a-38 had failed prematurely, requiring patients to undergo revision surgeries. *Id.* ¶¶ 53, 62; ELH-19-607, ECF 1, ¶ 18. To date, more than 350 adverse events associated with the Magnum have been reported to the FDA. ELH-12-1436, ECF 43, ¶ 62. Furthermore, Biomet was apprised of issues with the Magnum through its interactions with surgeons. *Id.* ¶ 55.

However, despite knowing about issues with its MoM implants, Biomet neither removed these devices from the market nor warned the public about them. *Id.* ¶ 63. Instead, Biomet aggressively advertised its metal implants as superior to other hip implants. *Id.* ¶ 64; ELH-19-607, ECF 1, ¶ 22. And, Biomet allegedly omitted information regarding its implants' safety and efficacy from surgeons and patients. ELH-12-1436, ECF 43, ¶¶ 65, 90. According to plaintiffs, Biomet intentionally concealed the defects with its MoM devices because the Magnum was one of its most profitable products and Biomet was seeking to be acquired. *Id.* ¶ 92.

### B. Plaintiffs' Medical Histories

#### 1. Ms. McCoy

Ms. McCoy has lumbar degenerative disease as well as arthritis. ELH 12-1436, ECF 65-5 ("Ex. E," McCoy Medical Records) at 2, 19. Ms. McCoy had a Magnum implanted in her right hip on December 6, 2007, at the age of fifty-five. *Id.* at 6, 8. The surgery was performed by Dr. Marc Brassard at Anne Arundel Medical Center in Annapolis, Maryland. *Id.* Ms. McCoy's right hip was revised on May 10, 2010, by Dr. Frank Ebert at Union Memorial Hospital in Baltimore, Maryland. *Id.* at 14. Dr. Ebert removed the acetabular shell and implanted a temporary spacer acetabular component. *Id.* Dr. Elbert performed a second right hip revision on Ms. McCoy on March 1, 2011. *Id.* at 17-18. This time, Dr. Ebert implanted a new hip device. *Id.* On November 8, 2011, Ms. McCoy had her left hip replaced by Dr. Ebert at Union Memorial Hospital. *Id.* at 19.

#### 2. Mr. Oswald

Mr. Oswald suffers from lumbar degenerative disease and osteoarthritis. ELH-19-607, ECF 249-7 ("Ex. G," Oswald Medical Records) at 3. On February 16, 2005, Mr. Oswald underwent a right total hip replacement, performed by Dr. Bruce Zimmer at Inova Alexandria Hospital in Alexandria, Virginia. *Id.* at 5. At the time, Mr. Oswald was sixty-one. Dr. Zimmer implanted the 2004 version of Biomet's M2a-38 device in Mr. Oswald's right hip. *Id.* at 6.

The M2a-38 device in Mr. Oswald's right hip was revised in two stages. *Id.* at 7-9. On April 26, 2006, Dr. Zimmer removed the M2a-38 device and replaced it with a temporary hip implant device. *Id.* at 7-9. On July 19, 2006, Dr. Zimmer implanted the 2005 version of Biomet's M2a-38 in Mr. Oswald's right hip. *Id.* at 10-12. Both surgeries occurred at the Inova Alexandria Hospital in Virginia. *Id.* at 7, 10.

Mr. Oswald had another revision surgery on February 10, 2012, performed by Dr. Tariq Nayfeh at Johns Hopkins Bayview Medical Center in Baltimore, Maryland. *Id.* at 16-17. Mr. Oswald received a non-metallic right hip stem and head. *Id.* After Mr. Oswald twice dislocated his right hip, Dr. Nayfeh performed a third revision surgery on March 23, 2012. *Id.* at 18-19.

### C. Procedural History

As noted, on October 2, 2012, the JPML created MDL No. 2391 in the Northern District of Indiana, assigning Judge Miller to coordinate pretrial proceedings for all lawsuits alleging defects with Biomet's Magnum and its predecessor product, the M2a-38. *See In re: Biomet*, 896 F. Supp. 2d at 1340 n.2, 1341. At the time, Biomet opposed centralization, arguing that "individualized, plaintiff-specific issues will predominate among the actions." *Id.* at 1339-40. But, the JPML rejected that contention. It observed that "'almost all injury litigation involves questions of causation that are case- and plaintiff-specific. Such differences have not been an impediment to centralization in the past.'" *Id*. at 1340 (quoting *In re Wright Med. Tech., Inc., Conserve Hip Implant Prods. Liab. Litig*., 844 F. Supp. 3d 1371, 1372 (J.P.M.L. 2012)). And, it found that the "central issues in these cases may well be whether a common defect has led to the injuries alleged." *Id.* Thus, because the lawsuits "share factual questions concerning design, manufacture, marketing and performance of Biomet's M2A Magnum system," the JPML concluded that "centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation[.]" *Id.*

"To eliminate delays associated with the transfer cases from other federal district courts to [the MDL] and to promote judicial efficiency," Judge Miller permitted any plaintiff whose case would have been subject to transfer to MDL No. 2391 to file his or her case directly in the Northern District of Indiana. MDL-2391, Dkt. No. 3096. However, direct filing was "contingent on the

7

understanding that upon completion of all pretrial proceedings . . . th[e] court w[ould], pursuant to 28 U.S.C. § 1404(a), transfer the case to a federal district of proper venue, as defined by 28 U.S.C. § 1391, unless the parties expressly agree to an alternate venue." *Id.*

Plaintiffs separately filed suit against Biomet. Ms. McCoy filed her Complaint in the District of Maryland on May 11, 2012. ELH-12-1436, ECF 1. Her case was transferred to the MDL on October 23, 2012. ELH-12-1436, ECF 21. Mr. Oswald filed his Complaint in the Northern District of Indiana on May 22, 2013. ELH-19-607, ECF 1.

As noted, plaintiffs lodge claims against Biomet under Maryland law. Ms. McCoy asserts claims of strict product liability (Count I); negligence (Count II); breach of implied warranties (Count III); breach of express warranties (Count IV); punitive damages (Count V); and loss of consortium (Count V). ELH-12-1436, ECF 43.[6] Mr. Oswald's complaint contains the following seven counts: "Strict Liability: Manufacturing Defect" (Count I); "Strict Liability: Failure to Warn" (Count II); negligence (Count III); "Negligence: Design Defect" (Count IV); fraudulent concealment (Count V); breach of implied warranties (Count VI); breach of express warranties (Count VII); and punitive damages (Count VIII). ELH-19-607, ECF 1.

As indicated, Judge Miller transferred the *McCoy* matter to the District of Maryland on September 19, 2018. MDL-2391, Dkt. No. 3724; *see* ELH-18-3924, ECF 22. Mr. Oswald's case was remanded to this District on February 22, 2019, as part of the third remand group. MDL-2391, Dkt. No. 3756; *see* ELH-19-607, ECF 236. In the transfer order, Judge Miller explained that of the approximately 3,000 cases that were part of the MDL, 90% had settled as part of a master settlement agreement arrived at in 2014. *See* MDL-2391, Dkt. No. 3738 at 2-3, 6; *see also*

---

[6] Ms. McCoy's amended complaint labels the fifth and sixth counts as "Count VI." *See* ELH-12-1436, ECF 43 at 30-31. Numerically, her claim for punitive damages is the fifth count, and the sixth is for loss of consortium.

MDL-2391, Dkt. No. 1317 (Master Settlement Agreement). Accordingly, the remaining cases were being sent to their proper districts for trial. MDL-2391, Dkt. No. 3738 at 13. Further, Judge Miller observed, *id.*:

> Any case might present its own atypical need, but for the most part, here is what will be left to do after remand: (1) additional, non-duplicative, case-specific depositions; (2) disclosure of case-specific experts, service of case-specific expert reports, and case-specific expert depositions; (3) any motions addressing the testimony of case-specific experts; (4) any motions (or, perhaps, trial objections) directed to the recorded trial testimony of the plaintiffs' generic experts; (5) any other motions addressing the testimony of generic or case-specific experts; and (6) any summary judgment motions.

## II. Discussion

### A. Rule 42

Rule 42(a) of the Federal Rules of Civil Procedure governs the consolidation of cases for trial. It provides:

(a) CONSOLIDATION. If actions before the court involve a common question of law or fact, the court may:

(1) join for hearing or trial any or all matters at issue in the actions;

(2) consolidate the actions; or

(3) issue any other orders to avoid unnecessary cost or delay.

(b) SEPARATE TRIALS. For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

The Rule "permits, but does not mandate, consolidation of cases that involve a common question of law or fact." *CX Reinsurance Co. v. Leader Realty Co.*, JKB-15-3054, 2016 WL 6696050, at *1 (D. Md. Nov. 15, 2016). The district court is vested with "broad discretion to decide whether consolidation under Rule 42(a) would be desirable . . . ." 9A C. WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2383 (3d ed. 2019); *see also, e.g., R.M.S. Titanic,*

*Inc. v. Haver*, 171 F.3d 943, 959 (4th Cir. 1999) (noting the discretion of the district court under Rule 42(a)).

In making its determination, a district court must "weigh the saving of time and effort that consolidation under Rule 42(a) would produce against any inconvenience, delay, or expense that it would cause for the litigants and the trial judge." WRIGHT & MILLER, § 2383. The Fourth Circuit has said:

> The critical question for the district court in the final analysis was whether the specific risks of prejudice and possible confusion were overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir. 1982), *rev'd on other grounds,* 712 F.2d 899 (4th Cir. 1983) (en banc); *see also Campbell v. Bos. Sci. Corp.*, 882 F.3d 70, 74 (4th Cir. 2018) (applying the *Arnold* factors); *CX Reinsurance Co.*, 2016 WL 6696050 at *1-2; *CSX Transp., Inc. v. Alban Waste, LLC*, JKB-13-1770, 2014 WL 1340041, at *2 (D. Md. Apr. 2, 2014); *Dring v. Faust*, WDQ-12-2344, 2013 WL 657638, at *1 (D. Md. Feb. 21, 2013).

Notably, "the mere fact that a common question is present, and that consolidation therefore is permissible under Rule 42(a), does not mean that the trial court judge must order consolidation.[]" WRIGHT & MILLER, § 2383. Moreover, a court need not consolidate for trial, but may instead consolidate cases "in their pretrial stage" as "a desirable administrative technique[.]" *Id.* § 2382; *see also Rishell v. Computer Scis. Corp.*, No. 1:13-CV-931, 2014 WL 11515835, at *1 (E.D. Va. Apr. 4, 2014) ("[I]ncluded within [a district court's] discretion is consolidation for discovery and pre-trial purposes.").

### B. Analysis

#### 1. Common questions of fact and law

Plaintiffs argue that consolidation is appropriate because they share common questions of fact and law. ECF 54 at 7. They point out that they share many common facts, namely having been implanted "at similar times with identical or nearly identical products and warnings." *Id.* And, they stress that their actions share factual questions concerning their implants' design, manufacture, and marketing. *Id.* at 5-6. Consequently, plaintiffs aver that the "the evidence at trial will significantly overlap." *Id.* at 7.

In response, Biomet argues vigorously that plaintiffs' suits are rife with individual issues. ECF 66 at 15-19. In particular, Biomet details plaintiffs' medical histories, which it maintains share few common facts. *Id.* at 17-18. And, Biomet points out that Ms. McCoy and Mr. Oswald were implanted with different Biomet products—the Magnum and M2a-38—which have different designs, underwent separate FDA approval processes, and contain different warnings. *Id.* at 16-17. In light of these differences, Biomet warns that consolidation would produce a "towering mass of litigation." *Id.* at 16.

Plaintiffs rely heavily on the case of *Campbell v. Boston Scientific Corporation*, 882 F.3d 70 (4th Cir. 2018). There, the Fourth Circuit reviewed the propriety of consolidating for trial four medical device products liability cases. The plaintiffs in *Campbell* were four women who had been implanted with transvaginal mesh, a medical device manufactured by Boston Scientific Corporation ("BSC") to treat severe stress urinary incontinence. *Id.* at 73. Plaintiffs separately filed suit against BSC, alleging that the device's defects were responsible for the post-implantation complications they experienced. *Id.* They sought compensatory and punitive damages "based on theories of negligence and strict liability for both design defects and failure to warn." *Id.*

The plaintiffs' cases were transferred to an MDL in the Southern District of West Virginia, which consolidated their cases with seven others for trial. After six cases were dismissed and one was removed from the consolidated action, BSC moved to separate the four remaining cases for trial. The district court denied the motion. *Id.* Following an eleven-day trial, the jury returned verdicts in favor of plaintiffs, awarding each plaintiff $250,000 in past compensatory damages, $1 million in punitive damages, and future compensatory damages ranging from $3 million to $4 million. *Id.* BSC appealed, arguing, *inter alia*, that the district court abused its discretion by consolidating the cases under Rule 42(a) because individual issues predominated.

The Fourth Circuit rejected this challenge. *Id.* at 76. It reasoned, *id.*:

> The district court . . . . first identified the many common questions of law and fact across the trials: The four plaintiffs were each diagnosed with stress urinary incontinence before being implanted with Obtryx devices made by BSC. Each plaintiff alleged that she had experienced similar complications from the Obtryx that required additional medical treatment. Each plaintiff received her Obtryx implant in West Virginia and asserted the same design-defect and failure-to-warn claims under West Virginia law. Because of these many similarities among the cases, the plaintiffs shared expert witnesses and relied on much of the same evidence from BSC documents. BSC asserted in all four cases both that the Obtryx was not defective and that the Obtryx's directions for use provided sufficient warnings. These many similarities certainly provided the "common question[s] of law or fact" required by Rule 42(a). They also make clear that separate trials would have been largely repetitive, and thus would have implicated the burdens, delays, and expense that *Arnold* noted help justify consolidation.

Here, plaintiffs' lawsuits have some facts in common. They are both presently citizens of Maryland. ELH-12-1436, ECF 43, ¶ 3; ELH-19-607, ECF 1, ¶ 1.[7] They were both implanted with a MoM hip replacement system designed and manufactured by Biomet. ELH-12-1436, ECF 43, ¶ 93; ELH-19-607, ECF 1, ¶ 25. And, their implantations occurred in the same two-year window.

---

[7] The Complaint states that Mr. Oswald was a citizen of Virginia at the time of his implant. ELH-19-607, ECF 1, ¶ 1. However, the Complaint does not specify when Mr. Oswald became a Maryland citizen. *See id.*

Ex. E at 6; Ex. G at 5. Notably, both plaintiffs allege the same injuries: metal poisoning, pain and discomfort, and having to undergo revision surgery to replace the defective Biomet implant. ELH-12-1436, ECF 43, ¶¶ 95, 98; ELH-19-607, ECF 1, ¶ 35; Ex. E at 14; Ex. G. at 7-9.

However, this case is distinguishable from *Campbell* in two significant respects. First, the four plaintiffs in *Campbell* were implanted with the same medical device. 882 F.3d at 76. This meant that the evidence that each plaintiff needed to muster to establish the design-defect and failure-to-warn claims was the same. In contrast, plaintiffs here received different Biomet devices: Ms. McCoy was implanted with a Magnum; Mr. Oswald received a M2a-38. ELH-12-1436, ECF 43, ¶¶ 93; Ex. E. at 8. As Biomet points out, "[t]hese devices each have a different design, were cleared for market by the FDA through separate regulatory submissions, and contained different IFUs listing warnings and potential adverse events particular to that device[.]" ECF 65 at 17. Moreover, in addition to having to adduce device-specific evidence, plaintiffs will have to prove that their implant caused their injuries. Such causation evidence will also entail the production of individualized evidence concerning the plaintiff's medical history. *See* ECF 65 at 17-18 (highlighting plaintiffs' differing etiologies). Because plaintiffs were implanted with different Biomet devices, they do not share overlapping evidence about the medical devices.

Second, the *Campbell* plaintiffs received the defective implant in the same state, and they each asserted claims under the law of the same state. 882 F.3d at 76. Here, Ms. McCoy received her Biomet device in Maryland, but Mr. Oswald's implantation occurred in Virginia. And, two of Mr. Oswald's revision surgeries occurred in Virginia as well. This is a material difference, because it may affect which state's law governs each plaintiff's claims.

Under Maryland's choice-of-law principles, tort claims are governed by the law of the state where the alleged harm occurred ("*lex loci delicto*"). *See, e.g.*, *Lewis v. Waletzky*, 422 Md. 647,

13

657, 31 A.3d 123, 129 (2011); P*roctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010). Although Mr. Oswald lodges claims against Biomet under Maryland law, it is not clear that Maryland law governs his case; Virginia law may control instead. Therefore, it may be the case that plaintiffs' actions do not share common legal issues.[8]

Accordingly, despite some factual similarities, individual issues predominate in plaintiffs' cases; they were implanted with different Biomet devices in different states. This counsels against consolidation under Rule 42(a). *See Hasman v. G.D. Searle & Co.*, 106 F.R.D. 459, 461 (E.D. Mich. 1985) ("When cases involve some common issues but *individual issues* predominate, consolidation should be denied." (emphasis in original)); *accord Michael v. Wyeth, LLC*, No. 2:04-0435, 20111 WL 1527581 at *2 (S.D.W.Va. Apr. 20, 2011) (declining to consolidate three pharmaceutical product liability cases, in part, because plaintiffs took "somewhat different" drugs "in varying doses").

## 2. Prejudice

According to plaintiffs, consolidation poses no risk of prejudice. ECF 54 at 7. In their view, "any potential risk of confusion or prejudice in a consolidated trial can be minimized by the use of cautionary instructions and other means." *Id.* Biomet sees things differently. It asserts that it will be prejudiced by "spillover evidence," *i.e.*, evidence that is admissible as to some but not other plaintiffs. ECF 65 at 19. And, it maintains that consolidation "would violate due process" because the jury might award punitive damages based on plaintiffs' collective injuries, rather than, as the Due Process Clause requires, the harm suffered by each plaintiff individually. *Id.* at 21 (citing *Philip Morris v. Williams*, 549 U.S. 346, 355 (2007)).

---

[8] Biomet did not raise this issue in its Opposition. Nonetheless, it is of concern to the Court.

Biomet's argument that due process forecloses consolidation is not persuasive. Constitutional due process "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation." *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007). Thus, "courts cannot authorize procedures that create an unreasonable and unnecessary risk of any such confusion occurring" and must "provide *some* form of protection" to guard against improper punitive damages awards. *Id.* at 1065 (emphasis in original). But, Biomet points to no case, and the Court's limited research has not uncovered a published decision, holding that consolidating suits pursuant to Rule 42(a) violates due process if the plaintiffs seek punitive damages. Indeed, the *Campbell* Court found no issue with the district court's decision to consolidate the cases for trial notwithstanding the jury assigning the plaintiffs *identical* punitive damages awards. 882 F.3d at 75.

However, I agree with Biomet that spillover evidence may prejudice Biomet if plaintiffs' actions are consolidated. In *Campbell*, the Fourth Circuit was emphatic: "[C]onsolidation is not appropriate if it would deny a party a fair trial." 882 F.3d at 75. That is a real risk here in light of the jury being presented with two plaintiffs complaining of similar injuries allegedly caused by two different products designed and manufactured by the same defendant. It may be that both the Magnum and Ma2-38 are defective. But, both devices could be medically sound. Or, it may be the case that the devices present distinct flaws, or that one contains a design flaw or incomplete warning that the other does not. Yet, a jury may be tempted to conclude that, in light of plaintiffs' similar complaints, both devices are defective. In other words, the jury may impute the flaws of one implant to the other, rending that device "guilty by association."

Of course, cautionary instructions can be employed to minimize spillover evidence. Nonetheless, in my view, given the significant risk of prejudice to Biomet, a cautionary instruction would not provide adequate protection.

### 3. Judicial economy and convenience

Plaintiffs argue that consolidation furthers the interests of judicial economy and convenience, contending that it will expedite discovery, streamline motions practice, and avoid duplicative testimony. ECF 54 at 10. But, Biomet counters that the potential benefits of consolidation in this case are illusory. ECF 65 at 22-25. It maintains that consolidation is not necessary to prevent inconsistent adjudications because the plaintiffs' unique medical histories mean that disparate verdicts are not actually "inconsistent." *Id.* at 22. Nor will consolidation promote efficiency, according to Biomet, because separate trials are less burdensome on the Court and jurors, minimize the potential for a mistrial or appealable mistakes, and avoid having present fact and expert testimony specific to each plaintiff in a single trial. *Id.* at 24-25.

In my view, aggregation will not advance the goals of judicial economy, efficiency, and convenience. Given the factual and legal differences between plaintiffs, trying their cases together will be, at best, cumbersome and, at worst, confusing and prejudicial. Indeed, the burdens a consolidated trial will impose on the parties, the Court, and the jury will easily eclipse the time saved by avoiding duplicative testimony.

## III. Conclusion

In sum, I am keenly aware of the costs associated with forgoing consolidation. But, in this instance, the factors weighing in favor of consolidation are overborne by the risk of juror confusion and prejudice. Therefore, I shall DENY plaintiffs' Motion. ELH-12-1436, ECF 54; ELH-19-607,

ECF 241.

An Order follows, consistent with this Memorandum Opinion.

Date: November 25, 2019         /s/
                                Ellen L. Hollander
                                United States District Judge